# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **TERRY THOMAS,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:07cv00047 |
| | ) | **REPORT AND RECOMMENDATION** |
| **BOSTON MUTUAL LIFE** | ) | |
| **INSURANCE COMPANY,** | ) | |
| Defendant, | ) | By:  PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Terry Thomas, filed this action challenging the final decision of Boston Mutual Life Insurance Company, ("Boston Mutual"), denying Thomas's claim for long-term disability insurance benefits, ("LTD"), under a group disability insurance policy issued to the employees of Pennington Gap HMA, Inc. d/b/a Lee Regional Medical Center.  This cause of action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C.A. §§ 1001 *et seq.* (West 1999 & Supp. 2007) ("ERISA"). Jurisdiction of this court exists pursuant to 29 U.S.C.A. §§ 1132(e) and (f) (West 1999). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The disability insurance policy at issue in this case, G-52932 with an effective date of January 1, 2002, ("the Policy"), expressly vests Boston Mutual with "discretionary" authority both to determine eligibility for benefits and to construe the

-1-

terms of the Policy. Specifically, the Policy states that "[Boston Mutual has] the discretionary authority to determine ... eligibility for benefits and to construe the terms of the policy to make a benefits determination." (R. at 464.) In cases such as this, where the benefit plan grants the administrator or fiduciary discretionary authority to determine eligibility or to construe the terms of the plan, a denial decision must be reviewed for abuse of discretion. *See Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997); *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997). A series of factors must be considered in determining whether an administrator or fiduciary has abused its discretion, including: (1) the scope of discretion conferred; (2) the purpose of the plan provision in which discretion is granted; (3) any external standard relevant to the exercise of that discretion; (4) the administrator's motives; and (5) any conflict of interest under which the administrator operates in making its decision. *See Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 89 (4th Cir. 1996) citing RESTATEMENT (SECOND) OF TRUSTS § 187 cmt. d (1957). Under this abuse of discretion standard, if the administrator's decision is supported by substantial evidence and is in accordance with the law and the language of the plan, the decision must be sustained, even if the court believes that substantial evidence also supports a contrary result. *See Sargent v. Holland,* 925 F. Supp. 1155, 1159 (S.D. W.Va. 1996); *see Lockhart v. UMWA 1974 Pension Trust*, 5 F.3d 74, 78 (4th Cir. 1993).

Nonetheless, in cases such as this, where a benefit plan acts as both fiduciary of the plan's beneficiaries and the plan's insurer, the Fourth Circuit has held that a court must use a "sliding scale abuse of discretion standard," reducing the deference given to the fiduciary to the degree necessary to neutralize any influence resulting from the conflict. *See Ellis,* 126 F.3d at 233; *Bedrick v. Travelers Ins. Co.*, 93 F.3d

-2-

149, 152 (4th Cir. 1996); *Hickey v. Digital Equip. Corp.*, 43 F.3d 941, 946-47 (4th Cir. 1995). "The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it." *Ellis*, 126 F.3d. at 233.

Thomas was approved to receive disability benefits under the Policy on or about February 14, 2003, effective from December 20, 2002, based on a claim that he was totally disabled by psychological problems, including severe depression, severe back pain, ulnar nerve damage, hypothyroidism, hyperlipidemia, weight loss, fibromyalgia and other medical problems, beginning June 4, 2002. (R. at 285.) Thereafter, Thomas applied for, and was awarded Social Security disability income, ("SSDI"), benefits by Notice of Award dated April 10, 2004. (R. at 190-93.) By letter dated November 29, 2004, Thomas was informed that his LTD benefits would be terminated as of December 21, 2004, based on a finding that his symptoms were not severe enough to preclude him from performing the material duties of any gainful employment. (R. at 13-16.) Thomas appealed the denial on May 13, 2005, thereafter providing additional medical records. By letter dated September 12, 2005, Boston Mutual, through its claims administrator, Disability Reinsurance Management Services, Inc., ("DRMS"), upheld the November 29, 2004, denial of Thomas's LTD benefits. On October 24, 2005, Thomas again appealed the denial of LTD benefits, again submitting additional medical records for review. On December 2, 2005, DRMS upheld its prior denial of LTD benefits. Thomas then filed this action seeking judicial review of Boston Mutual's decision. (Docket Item No. 1.)

-3-

This case is before the court on cross motions for summary judgment. (Docket Item Nos. 16, 18.) Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). Where the court must decide the case on the basis of an administrative record, the summary judgment motion "stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the court's review." *Krichbaum v. Kelley*, 844 F. Supp. 1107, 1110 (W.D. Va. 1994). The parties in this case have raised no material factual disputes and have submitted an administrative record of nearly 800 pages for the court's review. Therefore, the case appears ripe for decision under Federal Rule of Civil Procedure 56(c).

## II. Facts

Thomas was born in 1960, and has a high school education with one year of training in auto mechanics. (R. at 276.) Thomas worked at Lee Regional Medical Center, ("LRMC"), as a phlebotomy clerk/supervisor until the alleged onset date of his disability on June 4, 2002. According to a job description, which was provided by LRMC, Thomas's primary tasks as a phlebotomy supervisor were to demonstrate knowledge of the job, which enables the lab support associate to perform procedures expeditiously; perform venous and capillary sticks to obtain blood specimens; collect and receive other body fluid specimens and administer oral glucose beverages for glucose tolerance; perform high quality work as demonstrated by accuracy in job performance; plan and utilize time in order to ensure accurate and timely reporting of laboratory tests; maintain clean and well stocked work environment while showing concern and appreciation for co-containment; perform other duties in a professional

-4-

and cooperative manner; and adhere to and follow the principles of LRMC's Quality Customer Relations Program. (R. at 350-53.) According to this description, Thomas's job required him to continuously walk and/or stand and frequently bend/stoop and/or crouch. (R. at 353.) The description also states that Thomas occasionally was required to lift items weighing up to 75 pounds and was frequently required to lift items weighing up to 10 pounds. (R. at 353.) The description further states that Thomas was required to occasionally carry items weighing up to 10 pounds, and he was required to frequently push and/or pull, as well as balance, and occasionally twist and/or turn, crouch and/or stoop, kneel and reach. (R. at 354.) It states that continuous handling and/or manual dexterity was required. (R. at 354.) In an undated Training, Education and Experience Form, Thomas stated that his job as a phlebotomy clerk/supervisor required him to draw blood, perform clerical work, process specimens for reference labs, perform some computer work, perform evaluations, order, unload and stock supplies, clean for infection control and supervise other clerks/phlebotomists. (R. at 276.)

As stated above, Thomas was insured under an LRMC employees' group disability insurance policy issued by Boston Mutual. The Policy states:

> "Disability" means that because of sickness or injury:
> - [the insured cannot] perform some or all of the material and substantial duties of [his] regular occupation and [he has] at least a 20% loss in [his] pre-disability earnings.
>   OR
> - while [the insured is] not able to perform some or all of the material and substantial duties of [his] regular occupation, [he is] working in any occupation and

[has] at least a 20% loss in [his] pre-disability earnings.

(R. at 444.) The Policy also states that Boston Mutual will continue payments to the insured beyond 24 months if due to the same sickness or injury:

- [the insured is] not able to perform the material and substantial duties of any gainful occupation.
  OR
- while [the insured is] not able to perform some or all of the material and substantial duties of [his] regular occupation, [he is] working in any occupation and [has] at least a 20% loss in [his] pre-disability earnings.

(R. at 444.)

"Material and substantial duties" are defined as duties that "are normally required for the performance of the occupation ... and cannot be reasonably omitted or changed." (R. at 444.) The Policy defines "regular occupation" as the insured's occupation, as performed nationally, that the insured is routinely performing when his disability begins. (R. at 445.) The Policy specifies that "regular occupation" does not mean the job that an insured is performing for a specific employer or at a specific location. (R. at 445.) The Policy defines "gainful occupation" as an occupation, considering the insured's past training, education and experience or for which he can be trained, that provides or can be expected to provide him, within 12 months of his return to work, with pre-tax income at least equal to his gross monthly payment. (R. at 445.)

-6-

The Administrative record before the court reveals that Thomas worked as a phlebotomy clerk/supervisor at LRMC from April 1988 through June 4, 2002. (R. at 276.) Thomas claims he stopped working on that date due to psychological problems, including severe depression, severe back pain, ulnar nerve damage, hypothyroidism, hyperlipidemia, weight loss, fibromyalgia and other medical problems. By letter dated February 14, 2003, Boston Mutual, through DRMS, informed Thomas that his LTD claim was approved based on his then-current restrictions and limitations supporting his inability to perform the duties of his regular occupation. (R. at 285.) The letter further informed Thomas that his benefits became payable on December 20, 2002. (R. at 285.) Thomas was informed that future benefit checks would continue while he remained contractually disabled, and that periodic updates regarding the status of his condition would be required. (R. at 285.)

The medical evidence shows that a CT scan of the brain, taken on October 16, 1999, showed a small focal calcification that was of uncertain significance. (R. at 726.) Treatment notes from Dr. Maurice E. Nida, D.O., one of Thomas's treating physicians, dated November 3, 1999, reveal diagnoses of improved migraines and mild arthritis of the lower back. (R. at 720.) On January 8, 2001, Dr. Nida noted that Thomas's thyroid was doing excellent, and Thomas informed Dr. Nida that he was able to do what he wanted. (R. at 719.) Thomas was diagnosed with hypothyroidism, depression, low back pain with degenerative joint disease, ("DJD"), eczema of the lower extremities and gastroesophageal reflux disease, ("GERD.") (R. at 719.)

On June 8, 2000, an ultrasound of Thomas's thyroid showed a very mild goiter presentation without discrete mass or cystic findings. (R. at 676.) In April 2001, Dr.

-7-

Nida noted that Thomas was doing "fairly good," but continued to have musculoskeletal complaints and that Effexor was working well for him.  (R. at 401.)  Dr. Nida stated that Thomas was very stiff and that he was very much restricted with both backward and forward bending.  (R. at 401.)  On October 15, 2001, Dr. Nida noted that Thomas's primary difficulty was elevated blood pressure, which he opined was related to Effexor.  (R. at 387.)  Thomas reported continued chronic back pain, and his affect appeared depressed.  (R. at 387.)  He had stiffness and tenderness in the posterior superior iliac spine joint area.  (R. at 387.)  Dr. Nida diagnosed hypothyroidism, elevated blood pressure, hyperlipidemia, chronic DJD and worsening depression, and he prescribed Paxil and Daypro.  (R. at 387.)  On September 15, 2002, an x-ray of the lumbar spine showed severe chronic disc disease at the lumbosacral junction, but an MRI showed no evidence of disc herniation.  (R. at 673-74.) X-rays of the lumbar spine taken on May 28, 2004, showed mild degenerative changes in the lower facets on the right, and x-rays of the cervical spine taken on October 15, 2004, showed straightening of the cervical lordosis, but no acute abnormality.  (R. at 723-24.)

On November 9, 2001, Thomas saw Dr. Kotay at Dr. Nida's referral for evaluation of low back pain with radiation into the hip.  (R. at 701.)  Thomas further reported numbness in the left arm and hand, radiating to the ring finger and the little finger.  (R. at 701.)  He also relayed left foot pain and occasional neck pain that sometimes radiated into the left shoulder and chest.  (R. at 701.)  Dr. Kotay noted that, clinically, Thomas's cervical spine was normal.  (R. at 690.)  The lumbar spine had slight restriction of forward flexion with moderate stiffness.  (R. at 690.)  Straight leg raise testing was negative, and Thomas's reflexes, motor power and sensations were

Case 2:07-cv-00047-GMW-PMS   Document 23   Filed 03/24/08   Page 8 of 34   Pageid#: 120

intact. (R. at 690.) An x-ray of the lumbosacral spine showed severe narrowing of the L5-S1 disc space and minimal narrowing of the L4-L5 disc space. (R. at 690.) An MRI showed degenerative disc disease at two levels of the spine with no evidence of neural compromise. (R. at 690.) Dr. Kotay prescribed physical therapy. (R. at 690.) Physical therapy notes through December 2001 do not show improvement in Thomas's condition, and he was discharged on a home exercise program. (R. at 686-88.) In January 2002, Dr. Nida opined that Thomas would likely not be able to continue working as a phlebotomist. (R. at 385.) He deemed Thomas's affect pleasant and indicated that Thomas had a normal gait. (R. at 385.) Thomas exhibited tenderness in the lumbosacral spine area, deep tendon reflexes were 2/4 and Thomas's motor strength was somewhat decreased. (R. at 385.) Dr. Nida diagnosed DJD, transient elevation of blood pressure, resolved, hyperlipidemia and depression. (R. at 385.)

On February 7, 2002, Thomas relayed continued considerable back problems with moderate muscle spasm. (R. at 701.) However, Dr. Kotay noted no evidence of nerve root compression. (R. at 701.) Dr. Kotay opined that Thomas's predominant problem was degenerative arthritis which typically improves with time. (R. at 701.) He encouraged Thomas to continue working. (R. at 701.) An x-ray of the left foot revealed a stress fracture. (R. at 700.) An electromyogram and nerve conduction study revealed ulnar nerve entrapment with intermittent symptoms on both sides. (R. at 693, 700.) Dr. Kotay prescribed an elbow splint and discussed the possibility of surgery with Thomas. (R. at 700.) In April 2002, Dr. Nida noted that Thomas was doing fairly well, but continued to have joint pain. (R. at 383.) Thomas informed Dr. Nida that he had suffered a blow to the head and was experiencing spinal pain. (R.

-9-

at 383.)  Dr. Nida prescribed Welcol and Zoloft.  (R. at 383.)  An x-ray of the cervical spine, taken on April 3, 2002, showed straightening of the curvature, but no acute bony injury.  (R. at 675.)

On May 7, 2002, Thomas continued to complain of back pain with no numbness of the legs and occasional neck pain.  (R. at 700.)  Dr. Kotay prescribed anti-inflammatories and an exercise program.  (R. at 700.)  On September 9, 2002, Thomas complained of back pain radiating to both gluteal areas and the tailbone, with some pain in the upper thigh.  (R. at 300.)  He also complained of residual pain from an old stress fracture of the left foot, as well as some left elbow pain.  (R. at 300.)  He stated that hand numbness had improved with the use of a brace.  (R. at 300.)  Thomas exhibited a slightly decreased range of motion of the lumbar spine, but straight leg raise testing was negative and reflexes, motor power and sensations were intact.  (R. at 300.)  Examination of the left foot revealed normal tarsometatarsal and intertarsal joints.  (R. at 300.)  Treatment notes from Dr. Nida dated September 2002 through December 2002, show diagnoses of weight loss, depression, persistent low back pain from DJD, hyperlipidemia, hypothyroidism and probable testosterone deficiency.  (R. at 307-09.)  An x-ray of the lumbar spine, taken on September 15, 2002, showed severe chronic disc disease at the lumbosacral junction.  (R. at 340.)  However, an MRI showed no evidence of disc herniation.  (R. at 341.)  A CT scan of Thomas's abdomen showed no significant abnormalities, as did CT scans of the pelvis and chest. (R. at 318-19.)

Dr. Nida completed an Attending Physician's Statement, at the request of DRMS, on October 23, 2002, indicating that Thomas could not perform any work and

that he would not be able to resume any part of his work. (R. at 323-24.) Dr. Nida opined that Thomas could function in most stress situations and engage in most interpersonal relations. (R. at 324.) He further opined that Thomas was not a suitable candidate for work rehabilitation. (R. at 324.) Dr. Nida concluded that Thomas was permanently disabled. (R. at 323-24.) Dr. Nida completed another Attending Physician's Statement on January 14, 2003, again indicating that Thomas could not perform work of any kind. (R. at 320.) He further indicated that Thomas could engage in only limited stress situations and in limited interpersonal relations. (R. at 321.) Dr. Nida concluded that Thomas was permanently disabled and that he did not expect any significant improvement in his condition in the future. (R. at 321.)

On February 18, 2003, Thomas complained of pain in the back, shoulders and feet. (R. at 245.) Dr. Nida diagnosed probable fibromyalgia. (R. at 245.) Dr. Nida completed a third Attending Physician's Statement on June 25, 2003, indicating again that Thomas was permanently disabled. (R. at 243.) In August 2003, Dr. Kotay administered a Toradol injection to help alleviate Thomas's low back pain. (R. at 381.) On August 29, 2003, Thomas complained of pain in the neck and difficulty sleeping. (R. at 212.) Dr. Nida diagnosed fibromyalgia and prescribed Neurontin. (R. at 212.) On November 25, 2003, Thomas continued to complain of sleep difficulties. (R. at 211.) He was diagnosed with osteoarthritis, anxiety and depression, among other things. (R. at 211.) Thomas underwent a sleep study at Norton Community Hospital on December 3, 2003, which was negative for significant obstructive sleep apnea process. (R. at 215.) However, it revealed a significant number of periodic leg movements for which medication was recommended. (R. at 215.)

Dr. Nida completed a Rest Questionnaire on January 13, 2004, indicating that Thomas required complete freedom to rest frequently without restriction. (R. at 210.) He further indicated that Thomas must lie down and/or rest for substantial periods of time during the day for relief of pain and/or fatigue. (R. at 210.) Dr. Nida also completed a Pain Questionnaire, finding that Thomas's pain was moderately severe, meaning that his impairment seriously affected his ability to function. (R. at 209.) Dr. Nida further completed a Physical Capacities Evaluation, indicating that Thomas could sit for up to 15 minutes without interruption, stand for up to 10 minutes without interruption and walk for up to 10 minutes without interruption. (R. at 208.) He found that Thomas could sit for a total of two hours and walk and stand for a total of one hour each in an eight-hour workday. (R. at 208.) Dr. Nida found that Thomas could occasionally carry items weighing up to 10 pounds, but could never carry items weighing more than that. (R. at 208.) He found that Thomas could not use his hands for the pushing and pulling of arm controls due to numbness and tingling in the upper extremities as a result of a previous ulnar nerve injury. (R. at 208.) Dr. Nida further found that Thomas could not use his feet for repetitive movements such as the pushing and pulling of leg controls. (R. at 208.) He opined that Thomas could never bend or squat, but could occasionally crawl, climb and reach. (R. at 208.) Dr. Nida concluded that Thomas was moderately restricted from working around unprotected heights, moving machinery, marked changes in temperature and humidity, driving automotive equipment and exposure to dust, fumes and gases. (R. at 208.) Dr. Nida indicated that Thomas had severe degenerative disc disease, ("DDD"), of the lumbar spine with chronic pain exacerbated by physical activity. (R. at 208.) He further noted that Thomas spent 50% of his day reclined or lying down for relief of symptoms. (R. at 208.)

Thomas received a favorable decision from the Social Security Administration on March 3, 2004, finding that Thomas became disabled on June 4, 2002, and was, therefore, eligible to receive Social Security disability income benefits. (R. at 104-07.) On February 26, 2004, Thomas stated that he was feeling "fairly well." (R. at 717.) Dr. Nida diagnosed GERD, hypothyroidism, osteoarthritis, anxiety, depression and hyperlipidemia, among other things. (R. at 717.) On April 10, 2004, the Social Security Administration informed Thomas that he was entitled to monthly SSDI benefits beginning December 2002. (R. at 190.) On April 13, 2004, DRMS informed Thomas of the change in the definition of disability after the expiration of the initial 24-month period under the Policy. (R. at 197.) DRMS informed Thomas that it was reviewing his disability status to determine his eligibility for continued benefits beyond that 24-month period, ending on December 20, 2004. (R. at 198.) Thomas was asked to update DRMS on his plans to return to work and all current activities toward that goal or to explain why he was incapable of gainful employment. (R. at 198.) On May 28, 2004, Thomas reported a low back injury approximately three weeks previously. (R. at 716.) He described pain in the lumbosacral area, mostly over the sacroiliac joints, with some radiation into the leg that seemed to be improving. (R. at 716.) A physical examination revealed some tenderness over the sacroiliac joints, but deep tendon reflexes and muscle strength were intact. (R. at 716.) Dr. Nida diagnosed exacerbation of chronic low back pain due to trauma, eczema, improved somewhat, GERD, hypothyroidism, osteoarthritis, anxiety, depression and hyperlipidemia, among other things. (R. at 716.) Dr. Nida prescribed Skelaxin. (R. at 716.)

On June 22, 2004, Cathy B. Shope, a physical therapist, completed a functional

-13-

capacity evaluation at the request of DRMS.  (R. at 67-69.)  Shope concluded that Thomas performed in the light physical demand category,[1] lifting 27 pounds floor-to-waist level, 17 pounds waist-to-overhead and carrying 17 pounds for 50 feet.  (R. at 67.)  He sat for a total of one hour.  (R. at 67.)  He walked in the evaluation, plus 15 minutes on the treadmill at 1.5 miles per hour.  (R. at 67.)  Thomas alternated sitting and standing during the evaluation for two hours, and he stood and walked for one hour.  (R. at 67.)  At the beginning of the evaluation, Thomas rated his pain as a four on a nine-point scale, with nine being the worst pain.  (R. at 67.)  He rated his pain as a four at the end of the evaluation as well.  (R. at 67-68.)  Thomas stated that he was able to drive short distances and was independent with activities of daily living.  (R. at 68.)  Shope indicated that he tested in the excellent category of cardiovascular endurance for his age.  (R. at 68.)  Shope determined that Thomas could occasionally perform partial squatting, static bending, pushing and pulling, could frequently perform repetitive partial squatting to lifting and forward reaching and could constantly grasp.[2]  (R. at 69.)

On July 27, 2004, DRMS referred Thomas to Edmond J. Calandra, a vocational rehabilitation counselor, for a vocational assessment to determine whether suitable

---

[1]While the Fourth Circuit has not spoken on this issue, the Second Circuit has adopted the Social Security Administration's definition of sedentary work in ERISA cases.  *See Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 n.5 (2d Cir. 2001).  This court finds that there is no reason to believe that the Social Security Administration's definitions of all exertional levels should not be adopted in ERISA cases.  That being the case, light work involves lifting items weighing up to 20 pounds at a time with frequent lifting and carrying of items weighing up to 10 pounds.  If an individual can perform light work, he also can perform sedentary work.  *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2007).

[2]"Occasional" is defined in the report as one to four times per hour, "frequent" is defined as five to 24 times per hour and "constant" is defined as more than 24 times per hour.  (R. at 69.)

alternative occupations existed in Thomas's geographical area. (R. at 46-48.) Based on Thomas's functional capacity for light work, his education and work history, Calandra concluded that Thomas could perform the jobs of a procurement clerk, a telemarketer, a customer service representative, an order clerk and an information clerk, all at the sedentary level of exertion.[3] (R. at 47.) Calandra noted that none of the enumerated occupations exceeded the work restrictions outlined in the June 22, 2004, functional capacity evaluation. (R. at 48.) Calandra listed expected earnings for each occupation, and he noted that these were gathered from the May 2003 U.S. Bureau of Labor Statistics for the State of Virginia. (R. at 47-48.) On August 10, 2004, Thomas reported restless legs and a pulled muscle in the left side of his neck. (R. at 715.) A physical examination showed tenderness in the left trapezius muscle. (R. at 715.) Dr. Nida diagnosed exacerbation of chronic low back pain due to trauma. (R. at 715.)

On October 6, 2004, Lana Merchant, an RN, completed a Medical Referral Form at the request of DRMS. (R. at 63.) Merchant was asked to review the June 22, 2004, functional capacity evaluation to clarify the positional tolerance testing, specifically, whether Thomas could sit/stand for one hour in total or one hour with a change of position for an eight-hour period. (R. at 63.) Merchant found that, per Thomas's report, he would be more comfortable if allowed to sit/stand and change positions periodically for comfort. (R. at 63.) On October 7, 2004, Sue Howard, a vocational rehabilitation consultant, completed a second vocational assessment at DRMS's request, specifically taking into account Thomas's need to alter positions

---

[3]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. *See* C.F.R. §§ 404.1567(a), 416.967(a) (2007).

from sitting to standing.  (R. at 51-55.)  Howard further was asked whether Thomas could perform his regular occupation, and a more local labor market survey was requested.  (R. at 51.)  Based on Thomas's education, employment history, transferable skills and residual functional capacity, Howard concluded that Thomas could perform the jobs of a hospital admitting clerk, a personnel scheduler, a receptionist, a medical voucher clerk, a calendar control clerk at a blood bank, a claims clerk and an appointment clerk, all at the sedentary level of exertion.  (R. at 53.)  Howard also found that Thomas could perform the jobs of a unit clerk and a blood donor unit assistant, both at the light level of exertion.  (R. at 53.)  Howard noted that she further agreed that Thomas could perform the occupations identified in the previous vocational assessment.  (R. at 53.)  She stated that all of the enumerated jobs would allow for a sit/stand option, noting in particular that the sedentary occupations typically could be performed by alternating sitting and standing and that many employers provide sit/stand workstations for those workers who need to change positions throughout the workday.  (R. at 54.)  Howard stated that the light jobs allowed for alternating sitting, standing and walking.  (R. at 54.)  Howard indicated that the wage data included in the vocational assessment was gathered from Economic Research Institute, ERI Salary and Geographic Assessors, July 2004, and was based on the mean hourly earnings with one year of experience in Big Stone Gap, Virginia. (R. at 54.)  Howard opined that Thomas could not perform his regular job as a phlebotomist/supervisor since it requires prolonged standing and walking and would not allow a worker to alternate sitting and standing as needed.  (R. at 54.)  She confirmed that all of the enumerated occupations exist in Thomas's geographical area by consulting with two labor market resources, the Bureau of Labor Statistics, Occupational Employment Statistics, 2003, for the Johnson City-Kingsport-Bristol,

-16-

Tennessee-Virginia MSA,[4] and the Virginia Employment Commission, Labor Market Information for the Southwest Region (which includes Lee County).   (R. at 54.)

On October 15, 2004, Thomas reported widespread large joint pains, specifically in the hands and knees.  (R. at 714.)  Dr. Nida noted a lot of swelling, but nothing systemic to suggest rheumatoid arthritis.  (R. at 714.)  Dr. Nida stated that despite recent functional testing suggesting that he could work with some limitations, he felt that Thomas remained totally and permanently disabled.  (R. at 714.)  Thomas stated that he experienced neck pain since the functional capacity evaluation as a result of having to lift objects over his head.  (R. at 714.)  Dr. Nida opined that Thomas's chronic conditions were stable at that time.  (R. at 714.)  He had no edema of the extremities, normal pulses, tenderness in the cervical spine, some swelling of the proximal joints of the hands and some tenderness in the knees, specifically the right.  (R. at 714.)  Dr. Nida diagnosed arthralgias, neck pain and benign prostatic hypertrophy.  (R. at 714.)  He again opined that Thomas was totally and permanently disabled.  (R. at 714.)  On October 19, 2004, DRMS asked Dr. Nida to further comment on his finding that Thomas spent 50% of his day reclined or lying down, given the June 22, 2004, functional capacity evaluation, which indicated that Thomas tested in the excellent category for his age regarding endurance and aerobic capacity. (R. at 44-45.)  The vocational assessments also were forwarded to Dr. Nida for his comments.  (R. at 44.)  Dr. Nida responded on October 21, 2004, stating that Thomas had to recline or lie down 50% of the day due to back pain.  (R. at 707.)  He opined

_____

[4]Howard noted that Thomas resides within a reasonable commuting distance from a portion of this metropolitan area.  (R. at 54.)  Howard further noted that all of the following counties are within a reasonable commuting distance from Thomas's residence in Jonesville, Virginia: Lee; Wise; Scott; Johnson, Tennessee; and Bell, Kentucky.  (R. at 54.)

-17-

that relief of back pain was not related to functional capacity or endurance in relation to Thomas's age.  (R. at 707.)  Dr. Nida again opined that Thomas was disabled due to back pain, and he admitted that pain was a predominantly subjective determination, but one that must be respected.  (R. at 707.)

Dr. Nida completed another Attending Physician's Statement on October 29, 2004, finding yet again that Thomas could not work at all.  (R. at 25-26.)  He opined that Thomas would not significantly improve in the future and that he was totally and permanently disabled.  (R. at 26.)  In a Medical Referral Form, dated November 8, 2004, Kristin Fielding, RN, a medical consultant for DRMS, agreed that pain could limit one's functional capabilities, but she noted that Thomas displayed the ability to perform at a functional level consistent with light capacity without experiencing an increase in pain.  (R. at 31.)  She further noted Thomas's excellent cardiovascular endurance, which would be unexpected in an individual who was functionally unable to perform any gainful activity.  (R. at 31.)  On November 10, 2004, Thomas stated that he had been doing fairly well with some continued right knee pain and right hand pain.  (R. at 712.)  He further reported chronic neck pain, low back pain and some recent chest pains, which he attributed to fibromyalgia and smoking.  (R. at 712.)  Dr. Nida diagnosed neck pain, chronic low back pain, benign prostatic hypertrophy and fibromyalgia.  (R. at 712.)  Thomas was prescribed Flomax and Ativan.  (R. at 712.)

By letter dated November 29, 2004, DRMS informed Thomas that it had completed a review of his claim for LTD benefits, and that it was unable to approve such benefits beyond December 20, 2004, because he no longer met the definition of disability.  (R. at 13-16.)

-18-

An operative note from December 27, 2004, shows that Thomas underwent an incision, drainage and culture of the right index finger at Norton Community Hospital after being bitten by a brown recluse spider. (R. at 630.) A CT scan of the chest from December 30, 2004, showed small effusions and subsegmental atelectasis in the right lung. (R. at 629.) Another CT scan of the chest, taken on January 14, 2005, showed slightly prominent markings in both lung apices, but no focal mass lesion was noted. (R. at 721.) On January 21, 2005, Thomas reported an inability to bend over due to back pain. (R. at 711.) He exhibited tenderness in the low back area. (R. at 711.) Dr. Nida diagnosed DJD of the spine, chronic low back pain and fibromyalgia. (R. at 711.) Dr. Nida completed a mental assessment of Thomas on March 8, 2005, at the request of the Social Security Administration. (R. at 708-10.) He concluded that Thomas was markedly limited in all areas of work-related mental functioning due to anxiety and depression. (R. at 708-09.) In an undated physical assessment, Dr. Nida concluded that Thomas could lift and carry items weighing less than 10 pounds both occasionally and frequently. (R. at 703-06.) He found that Thomas could stand and/or walk for a total of less than two hours in an eight-hour workday and that he could sit for less than six hours in an eight-hour workday. (R. at 703-04) Dr. Nida found that Thomas was limited in his ability to push and/or pull with both the upper and lower extremities. (R. at 704.) Dr. Nida found that Thomas could occasionally balance, but never climb, kneel, crouch, crawl or stoop. (R. at 704.) Dr. Nida concluded that Thomas was limited to an occasional ability to reach, to handle and finger objects and to feel. (R. at 705.) Lastly, Dr. Nida found that Thomas was limited from exposure to temperature extremes, dust, vibration, humidity and/or wetness, hazards and fumes, odors, chemicals and gases. (R. at 706.) He based all of these limitations on Thomas's DJD of the spine. (R. at 704-06.)

A chest x-ray from April 18, 2005, showed no acute cardiopulmonary process or change from the previous exam, and a CT scan of the chest the same day revealed nothing different. (R. at 618, 620.) On April 20, 2005, Thomas relayed increased anxiety, due to the death of an aunt, which was helped by Zoloft and Ativan. (R. at 616.) Dr. Nida noted that Thomas's gait appeared normal, and he had no clubbing, cyanosis or edema of the extremities. (R. at 616.) Dr. Nida diagnosed hypothyroidism, DJD of the spine, chronic back pain, fibromyalgia, osteoarthritis, benign prostatic hypertrophy and hyperlipidemia. (R. at 617.) Thomas's dosage of Flomax was increased. (R. at 617.)

On May 23, 2005, DRMS informed Thomas that his appeal for LTD benefits had been received. (R. at 664.) On June 24, 2005, Dr. Elizabeth Roaf, M.D., a physician board-certified in physical medicine and rehabilitation, internal medicine and spinal cord injury medicine, completed a medical record review at the request of DRMS. (R. at 590-608.) After reviewing Thomas's medical records, Dr. Roaf concluded that Thomas had severe degenerative disc disease at the L5-S1 level. (R. at 607.) She further noted Thomas's restless leg syndrome, which could impact his sleep and exacerbate his pain symptoms. (R. at 607.) Dr. Roaf noted that, although Thomas had been diagnosed with anxiety and depression by Dr. Nida, those appeared to have become an issue only after he stopped working. (R. at 607.) Dr. Roaf concluded that, although Thomas had degenerative disc disease of the lower lumbar spine, that would not preclude him from functioning in a full-time work environment, given the functional capacity evaluation revealing a capacity for light work. (R. at 607.) Nonetheless, Dr. Roaf found that, due to Thomas's reports of pain, which could be magnified by symptoms of anxiety and depression, he should be precluded from

continuous walking and standing, and would be more suited to a sedentary position with position changes being allowed every one to two hours as needed to help alleviate his pain symptoms. (R. at 607.) Dr. Roaf further found that Thomas should be limited to his exposure to temperature extremes, specifically cold temperatures since that could exacerbate his pain. (R. at 607.) She further concluded that Thomas should not be required to do any repetitive or sustained lumbar flexion and crouching, and she found that he should be precluded from bending. (R. at 608.) Dr. Roaf opined that due to Thomas's minimal left ulnar neuropathy, he should have no repetitive flexion of the left elbow and no repetitive use of the left upper extremity for lifting, pushing, pulling and like activities. (R. at 608.) She further opined that Thomas might be precluded from operating heavy machinery due to his restless leg syndrome and his ability to sleep. (R. at 608.) Dr. Roaf concluded that Thomas did not appear to be precluded from performing full-time sedentary work that allowed for these restrictions. (R. at 608.) However, she further noted that he should not be required to climb on ladders or work at heights. (R. at 608.) Dr. Roaf completed an addendum to her report on July 5, 2005, after Thomas submitted additional medical records for review.[5] (R. at 609-11.) Having reviewed the additional medical evidence, Dr. Roaf determined that they did not change the conclusions reached in her previous report. (R. at 610.)

On July 12, 2005, DRMS forwarded a copy of Dr. Roaf's reports to Thomas, and informed him of the opportunity to comment thereon if he was in disagreement

---

[5]The medical records submitted for review included the April 20, 2005, treatment note from Dr. Nida, the April 18, 2005, CT scan of Thomas's chest, as well as a chest x-ray, the treatment notes and x-rays relating to his finger surgery and a chest x-ray from December 30, 2004. (R. at 609-10.)

with the findings within 14 days.  (R. at 589.)  On July 29, 2005, Maria Provini-Salas, a vocational case manager, completed another Labor Market Survey Report, at the request of DRMS.  (R. at 572-75.)  Specifically, Provini-Salas was asked to determine whether an individual with the ability to perform sedentary to light work activity, who had to avoid continuous walking and standing, who must alternate between sitting and standing, who must avoid extreme temperature changes, crouching, bending, climbing ladders and working at heights, and who could not repetitively use the left upper extremity for lifting, pushing or pulling could perform the demands of full-time work. (R. at 572.)  Provini-Salas reviewed Dr. Roaf's reports, Calandra's vocational assessment and Howard's vocational assessment.  (R. at 572.)  The occupations reviewed were those of a customer service representative and a receptionist, both at the sedentary exertional level.  (R. at 572.)  Provini-Salas noted that several retailers were contacted within 50 miles of Thomas's residence in Jonesville, Virginia, in an effort to determine the availability of potential employment.  (R. at 575.)  A total of five potential employment opportunities were investigated, all sedentary to light in nature and allowing for all of Thomas's restrictions.[6]  (R. at 572-74.)  However, Provini-Salas concluded that only four of the five positions were viable based on criteria including physical demands, qualifications and reasonable wage.[7] (R. at 575.) Provini-Salas noted that the labor market wages were reported as a low salary of

---

[6]The three potential employers for the customer service representative included Advanced Call Center Technologies, located in Johnson City, Tennessee; Blockbuster Video, located in Kingsport, Tennessee; and Spherion Corporation, located in Johnson City, Tennessee. The two potential employers for the receptionist job included Medex Regional Laboratories, located in Big Stone Gap, Virginia; and Morristown-Hamblen Healthcare System, located in Morristown, Tennessee.  (R. at 573-74.)

[7]Provini-Salas's report does not specifically state which job was not a viable option for Thomas, but the information provided indicates that that there were no then-current openings available at Morristown-Hamblen Healthcare System.  (R. at 574.)

-22-

$240.00 per week to a high salary of $377.00 per week. (R. at 575.) Based on this labor market research, Provini-Salas concluded that there were potential employment opportunities that Thomas might be qualified for and that were within his physical capabilities. (R. at 575.)

On July 20, 2005, Thomas relayed symptoms of hypothyroidism, as well as severe back pain. (R. at 545.) A physical examination revealed no weakness, normal pulses and no clubbing, cyanosis or edema of the extremities. (R. at 545.) Dr. Nida decreased Thomas's dosage of Synthroid and ordered lab work. (R. at 546.) A CT scan of the chest from August 24, 2005, showed slightly prominent markings in both lung apices, but the overall appearance of the CT scan was unchanged from the previous exam dated April 18, 2005. (R. at 547-49.) By letter dated September 12, 2005, DRMS informed Thomas that, based on a thorough review of the information contained in his file, he no longer met the definition of disability and, therefore, he was not eligible for further benefits. (R. at 553-56.) Thus, DRMS upheld its November 29, 2004, decision. (R. at 555.)

By letter dated October 25, 2005, Thomas appealed DRMS's denial of his LTD benefits, and forwarded additional medical records from Dr. Nida, as well as the fully favorable decision from the Social Security Administration. (R. at 535.) Specifically, Thomas refuted Dr. Roaf's restrictions and limitations allowing for sedentary occupations based on the ALJ's conclusion that he was precluded from performing any substantial gainful activity on a regular and sustained basis, even at the sedentary level. (R. at 535.) On November 2, 2005, DRMS acknowledged the receipt of Thomas's second appeal for LTD benefits. (R. at 529.) Dr. Roaf was again asked to

-23-

consider additional medical evidence supplied by Thomas. On November 14, 2005, Dr. Roaf concluded that the medical records supported a diagnosis of degenerative disc disease of the lumbar spine and a mild ulnar neuropathy, unilateral in nature, on the left side. (R. at 512-16.) She further noted that Thomas suffered from right knee pain, restless leg syndrome, hyperlipidemia, hypothyroidism, neck pain, fibromyalgia, migraines, a history of stress fracture in the left foot and anxiety and depression. (R. at 515.) Thus, Dr. Roaf concluded that Thomas had underlying etiologies for pain. (R. at 515.) She further concluded that due to his disc degeneration and right knee pain, he should not be required to stand or walk for prolonged periods and should be allowed to change positions from standing to sitting as needed. (R. at 515.) Dr. Roaf further noted that Thomas had bilateral numbness and tingling due to the ulnar nerve injury, but that an electromyogram and nerve conduction study showed that it was mild and only on the left side. (R. at 515.) Thus, she concluded that the restrictions on Thomas's upper extremity use were unchanged from her previous reports. (R. at 515.) She noted that because Thomas was taking medications which had the potential to be sedating, he was precluded from operating heavy machinery. (R. at 515.) Dr. Roaf, therefore, concluded that, based on the records before her, in comparison to her report from June 24, 2005, these were the significant changes in restrictions. (R. at 515.) However, she again concluded, that even with these changed restrictions, Thomas was not precluded from full-time sedentary work as described in her previous report. (R. at 516.)

On November 17, 2005, Provini-Salas completed an addendum to her Labor Market Survey at the request of DRMS, specifically to contact the potential employers with additional physical restrictions, including no repetitive and sustained lumbar

flexion, no repetitive flexion of the left elbow and no operation of heavy equipment. (R. at 500-04.) Provini-Salas stated that all of the employers indicated that, although the occupations would not necessarily require the performance of these activities, should the need arise, they would be able to accommodate an individual with those restrictions. (R. at 504.) Provini-Salas also was asked to clarify why the occupations provided by Howard in her vocational assessment were not included in the previous Labor Market Survey. (R. at 504.) She indicated that those occupations were not viable due to either the employer being unable to provide requested information, wage criteria was not met, physical ability exceeded the client's capability, the claimant did not meet the qualification requirements or the researched position did not exist with the employer as paid employment.[8] (R. at 504.)

On December 2, 2005, DRMS upheld its decision to deny Thomas's claim for LTD benefits. (R. at 497-99.) DRMS stated that Thomas's claim was denied because the medical and vocational information supported his ability to perform other gainful occupations. (R. at 497.) Thereafter, on September 27, 2007, Thomas initiated the ERISA action currently before the court.

### III. Analysis

As stated above, this court must decide if Boston Mutual's decision to deny Thomas's LTD benefits after December 20, 2004, is supported by substantial evidence and is in accordance with the law and the language of the Policy. *See Sargent*, 925

---

[8]Provini-Salas specifically noted that the positions of a blood donor unit assistant and a calendar control clerk at a blood bank generally were performed on a volunteer basis. (R. at 504.)

F. Supp. at 1159; *Lockhart*, 5 F.3d at 78. Since Boston Mutual serves as both fiduciary and insurer of the Policy at issue, the court must view Boston Mutual's actions in light of this conflict and adjust the amount of deference given to Boston Mutual's decision accordingly. *See Ellis*, 126 F.3d at 233; *Bedrick*, 93 F.3d at 152.

Thomas has moved for summary judgment in his favor in this matter, asserting that there are no genuine issues of material fact in dispute and that he is entitled to summary judgment in his favor. He claims that Boston Mutual's denial of LTD benefits is unsupported and is in direct conflict with the substantial evidence of record. Thomas contends that Boston Mutual is wrongfully withholding the payment of LTD benefits to which he is entitled, thereby constituting an unlawful denial of benefits under ERISA. Boston Mutual has filed a cross motion for summary judgment, asserting that there are no material facts in dispute and that its decision to deny Thomas LTD benefits after December 20, 2004, is supported by the evidence in its claim file at the time of its decision.

Based on my review of Boston Mutual's claim file, I find that the undisputed evidence shows that Boston Mutual's decision to deny LTD benefits after the initial 24-month period is supported by substantial evidence and was in accordance with the law and language of the Policy. That being the case, I recommend that the court affirm Boston Mutual's decision. As previously discussed, the definition of "disability" under the Policy for the initial 24-month period required Thomas to show that he could not perform the material and substantial duties of his regular occupation. Thomas was able to make this showing because his job as a phlebotomy supervisor/clerk is classified as an occupation requiring light exertion, but one also not

-26-

allowing for a sit/stand option, which various medical and vocational consultants found that Thomas required, and a limitation which Boston Mutual does not dispute. However, after the initial 24-month benefits period, in this case ending on December 20, 2004, Thomas had to show that he was not able to perform the material and substantial duties of *any* gainful occupation in order to continue receiving LTD benefits. For the following reasons, I find that substantial evidence supports Boston Mutual's finding that Thomas could not make such a showing.

Boston Mutual had evidence before it that Thomas could perform the material and substantial duties of at least two occupations, namely that of a customer service representative and a receptionist, both at the sedentary level of exertion. The Policy defines "gainful occupation" as an "occupation, considering [an insured's] past training, education and experience or for which [the insured] can be trained that provides or can be expected to provide [the insured] within 12 months of [the insured's] return to work, with an income (before taxes) at least equal to [the insured's] gross monthly payment."

In his brief, Thomas argues that he is, in fact, disabled, and that this is evidenced by the opinions of his treating physicians, as well as by the fully favorable determination by the Social Security Administration, awarding him SSDI benefits on March 3, 2004. I first note that, while it is true that Thomas was awarded SSDI benefits, as Boston Mutual notes in its brief, the Fourth Circuit has held that ERISA plan administrators are not required to give greater weight to a determination by the Social Security Administration regarding social security benefits than to other evidence. *See Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 275 (4th

-27-

Cir. 2002); *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 607 (4th Cir. 1999). The reasoning behind these cases is that the disability standards under the social security scheme and those applicable to ERISA plans generally are not analogous. "[W]hat qualifies as a disability for social security disability purposes does not necessarily qualify as a disability for purposes of an ERISA benefit plan – the benefits provided depend entirely on the language in the plan." *Smith v. Cont'l Cas. Co.*, 369 F.3d 412, 420 (4th Cir. 2004). Therefore, I find that the favorable determination by the Social Security Administration need not be given greater weight than any other evidence Boston Mutual had before it in making its determination.

Moreover, as Boston Mutual notes in its brief, the determination of the Social Security Administration was made prior to the June 22, 2004, functional capacity evaluation, the vocational assessments provided by Calandra and Howard, the medical records review conducted by Dr. Roaf and the Labor Market Surveys completed by Provini-Salas, all of which support Boston Mutual's finding that Thomas could perform the material and substantial duties of other gainful occupations. As outlined in detail above, these sources found that Thomas could perform light and sedentary work that provided for a sit/stand option, that did not require exposure to temperature extremes, especially cold temperatures, that did not require repetitive or sustained lumbar flexion or crouching, that did not require bending, repetitive use of the left upper extremity, operating heavy machinery, climbing on ladders or working at heights. (R. at 504.) In particular, Provini-Salas concluded that, with all of these restrictions, Thomas could perform the jobs of a customer service representative and a receptionist, both sedentary to light in nature. (R. at 504.) Five potential employers, located within 50 miles of Thomas's residence, were contacted regarding these jobs.

Case 2:07-cv-00047-GMW-PMS   Document 23   Filed 03/24/08   Page 28 of 34   Pageid#: 140

(R. at 501-03.) The first employer, Advanced Call Center Technologies, informed Provini-Salas of the opportunity to alternate between sitting and standing when necessary since headsets would be provided. (R. at 572-73.) This employer further indicated that an individual with the ability to perform sedentary work, with no lifting of items weighing more than 10 pounds, could perform the demands of the job. (R. at 573.) A starting wage of $8.00 per hour was indicated. (R. at 573.) The next employer, Blockbuster Video, informed Provini-Salas of the availability of a sit/stand option, noting that a stool would be provided. (R. at 573.) The employer further indicated that an individual with the ability to perform sedentary work, with no lifting of items weighing more than 10 pounds, could perform the demands of the job. (R. at 573.) A starting wage of $6.00 per hour was indicated. (R. at 573.) The third employer, Spherion Corporation, indicated available positions for both customer service representatives and receptionists. (R. at 573.) This employer also noted the availability of a sit/stand option. (R. at 573.) The employer further indicated that an individual with the ability to perform sedentary/light duty work, with no lifting of items weighing more than 10 pounds, could perform the jobs. (R. at 573.) A starting wage of $8.00 to $9.00 per hour was indicated for these jobs. (R. at 573.) The fourth employer, Medex Regional Laboratories, indicated the availability of a sit/stand option when necessary and when not busy. (R. at 574.) This employer indicated that an individual with the ability to perform sedentary work, with no lifting of items weighing more than 10 pounds, could perform the job. (R. at 574.) Although the employer would not discuss wage information over the telephone, Provini-Salas noted that the Virginia Bureau of Labor Statistics indicated an hourly wage of $9.33 to $9.44 for receptionists in the Johnson City/Kingsport/Bristol TN/VA area. (R. at 574.) The last employer, Morristown-Hamblen Healthcare System, indicated that there were no

then-current openings for receptionists.  (R. at 574.)

Therefore, the information before Boston Mutual showed that jobs existed in Thomas's geographical area that allowed for his functional limitations and that could provide pre-tax income at least equal to his gross monthly LTD benefit payment of $1,256.40.  That being the case, I find that substantial evidence exists in the record to support Boston Mutual's decision to terminate Thomas's LTD benefits after December 20, 2004.  I further find that Boston Mutual's decision was the "result of a deliberate, principled reasoning process."  *Bernstein v. CaptialCare, Inc.,* 70 F.3d 783, 788 (4th Cir. 1995). That being the case, the court should not disturb Boston Mutual's judgment.  *See Bernstein*, 70 F.3d at 787.  All of this being said, I find that Boston Mutual did not abuse its discretion in terminating Thomas's LTD benefits.

Although Thomas argues that his treating physicians have repeatedly found him to be disabled, I note, as Boston Mutual notes in its brief, that there is not a treating physicians rule applicable to ERISA claims.  Specifically, as Boston Mutual notes in its brief, the Supreme Court held in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003), in the context of ERISA claims, plan administrators are not obligated to accord special deference to treating physicians' opinions.  That being the case, it was lawful for Boston Mutual to exercise its discretion and interpret the applicable provisions of the Policy using all available evidence relating to Thomas's medical conditions, residual functional capacity and the vocational capabilities.  The evidence contained in the administrative record, as detailed above, indicates that Thomas was capable of performing light and sedentary work with various restrictions, and that jobs existed that Thomas could perform such that he could not show that he was disabled

-30-

under the language of the Policy.

I further note that it does not appear that all of Thomas's treating physicians agreed that he was disabled. While Dr. Nida repeatedly completed reports stating that Thomas was permanently and totally disabled, Dr. Kotay, the orthopedic surgeon who treated Thomas for his primary musculoskeletal complaints, encouraged Thomas to continue to work. (R. at 701.) Furthermore, none of Dr. Kotay's medical records reflect that he ever placed any limitations on Thomas's work-related activities.

For all of the foregoing reasons, I recommend that the court deny Thomas's motion for summary judgment and grant summary judgment in favor of Boston Mutual.

Thomas also seeks an award of attorney's fees and costs under 29 U.S.C.A. § 1132(g). According to 29 U.S.C.A. § 1132(g)(1), "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." A district court must weight the following factors in determining whether to award attorney's fees in an ERISA case: (1) bad faith; (2) ability to pay; (3) potential for deterrence; and (4) the relative merits of the parties' claims. *See O'Bryhim v. Reliance Standard Life Ins. Co.*, No. 98-1472, 1999 WL 617891, at *9-10 (4th Cir. Aug. 16, 1999) (citing *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1029-30 (4th Cir. 1993)). I find that a balancing of these factors does not weigh in favor of an award of attorney's fees and costs to Thomas. First, there is no evidence of any bad faith on the part of Boston Mutual. As described in detail above, substantial evidence exists in the administrative record to support Boston Mutual's decision to terminate Thomas's LTD benefits as

of December 21, 2004. Next, there is no reason to believe that Boston Mutual does not have the ability to pay attorney's fees and costs. However, given that Boston Mutual has not acted in bad faith and, therefore, there is no need to deter other plan administrators from conducting themselves in the manner that Boston Mutual has, there is no argument for potential deterrence. Finally, while Thomas's claim certainly would not be classified as frivolous, given the fact that substantial evidence supports Boston Mutual's termination of LTD benefits, the merits of his claim are questionable in comparison to those of Boston Mutual. Thus, a balancing of these factors weighs against an award of attorney's fees and costs to Thomas under 29 U.S.C.A. § 1132(g), and I recommend that the court deny such a request.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1) Substantial evidence exists in this record to support Boston Mutual's finding that Thomas was not disabled after December 20, 2004; and

2) Boston Mutual's decision to deny disability benefits to Thomas was not an abuse of discretion.

-32-

# RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Thomas's motion for summary judgment, grant Boston Mutual's motion for summary judgment and affirm Boston Mutual's decision to deny LTD benefits to Thomas as of December 21, 2004. I further recommend that the court deny Thomas's motion for an award of attorney's fees and costs associated with this action.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge]. The judge may also receive further evidence or recommit the matter to the magistrate [judge] with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable Glen M. Williams, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      This 24th day of March 2008.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE